

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★   MAR 2 6 2012   ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

CARLOS GRAVES,

                    Petitioner,

       – against –

JOSEPH T. SMITH,

                  Respondent.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

**AMENDED
60(B) ORDER**

**02-CV-6550**

**Appearances:**

For petitioner:      Alan M. Nelson, Esq.
                    3000 Marcus Avenue, Suite 1E5
                    Lake Success, New York 11042

For respondent:    Office of the District Attorney of Kings County, New York
                    350 Jay Street
                    Brooklyn, New York 11201
                    By:    Diane Eisner, Esq.

**JACK B. WEINSTEIN, Senior District Judge:**

I.    Introduction ...................................................................................... 2

II.   Facts and Procedural History ........................................................ 3

    A.    State Court............................................................................. 3

        1.    Criminal Case ............................................................ 3

        2.    Direct Appeal............................................................. 3

        3.    First C.P.L. § 440 Motion........................................ 4

        4.    Coram Nobis Application ......................................... 5

        5.    Second C.P.L. § 440 Motion ................................... 5

        6.    Motion for Leave to Appeal Second C.P.L. § 440 Motion to the Appellate Division................................................................................ 6

        7.    Motion for Leave to Appeal to the New York Court of Appeals ...................... 7

        8.    Delay in State Appellate Practice Not Attributable to Defendant .................... 7

    B.    Federal Court........................................................................ 7

1

      1.   Collateral Proceedings in Federal Court...................................................... 7

      2.   Rule 60(b) Motion ............................................................................. 8

III.   Merits of the Rule 60(b) Motion ...................................................................... 9

   A.   Motion is Not Procedurally Barred ............................................................ 9

      1.   Motion is Timely .............................................................................. 9

      2.   Motion is Not a Successive Petition ..................................................... 9

   B.   *Cullen v. Pinholster* Does Not Preclude Reliance on Key Witness' Record ...... 10

   C.   AEDPA Would Not Bar Granting Writ .................................................... 11

   D.   Motion Denied on Merits ..................................................................... 12

      1.   The Government Suppressed Evidence .............................................. 15

      2.   The Evidence Was Favorable to the Defendant ................................... 18

      3.   A Different Result Was Not Reasonably Probable ............................... 24

IV.   Conclusion ................................................................................................... 28

## I.  Introduction

Pursuant to Rule 60(b)(4) of the Federal Rules of Civil Procedure, petitioner moves to vacate this court's 2003 order denying his petition for a writ of habeas corpus. Mem., Order, & J., Doc. Entry 16, Oct. 15, 2003. He argues that deciding his petition without holding an evidentiary hearing denied him due process, and led the court to reach the wrong result. *See* Pet. Mot. to Vacate J. Pursuant to Fed. Rules of Civ. Proc. Rule § 60(b), Doc. Entry 23, Apr. 19, 2010; Mem. of L. in Supp. of Pet. Rule 60(b) Mot., Doc. Entry 31, July 28, 2011; Non-Evidentiary Hr'g Tr., Aug.16, 2011.

The petitioner's claims that he was denied a fair trial have been repeatedly rejected. Yet it seemed on oral argument that the Rule 60(b) motion had possible merit. This court sent for, and has examined, the complete trial and appellate state court record. *See* Order, Doc. Entry 36, Aug.24, 2011. It now concludes once again that defendant is not entitled to a new trial on constitutional grounds.

Were this a direct appeal, a new trial would be likely, but, handicapped as the movant is by the weight of comity and law, he loses this bid for freedom. For the reasons stated below, petitioner's motion is denied.

## II.   **Facts and Procedural History**

### A.  **State Court**

#### 1. **Criminal Case**

In 1995, petitioner Carlos Graves was indicted in Kings County Supreme Court on several counts, including the murder of Troy Stewart and attempted murder of Sinclair Bibby. The crimes allegedly occurred during petitioner's attempt to rob the bodega where Bibby worked. Trial Tr. at 1421-22, 1456-58, *People v. Graves*, Ind. No. 9064/95 (Kings Cnty. Sup. Ct. July 23, 1996) ("Trial Tr.").

Sinclair Bibby, a/k/a/ Bibby St. Clair ("Bibby"), was a key witness for the prosecution. Almost immediately after the event, Bibby identified the petitioner as the fatal shooter. *See* Resp't Letter Opposing Rule 60(b) Mot., Ex. 1-2, Doc. Entry 38, Aug. 29, 2011. At trial, his testimony was consistent with his earlier statements regarding his direct observation of petitioner's criminal conduct during the incident. *See* Trial Tr. at 1420-1527.

#### 2. **Direct Appeal**

The direct state appeal raised the following issues: 1) the prosecutor's racially discriminatory exercise of peremptory challenges; 2) the judge's admission of prejudicial testimony regarding defendant's prior robbery of the bodega that was the scene of the crime, and of his possession of a shotgun; 3) the prosecution's failure to prove all elements of the crime; and

3

4) the judge's failure to deliver a self-defense charge. *See* Brief for the Appellant, *People v. Graves,* Ind. No. 9064/95, A.D. No. 96-08389 (2d Dep't Mar. 7, 2000). A pro se supplemental brief emphasized: 1) the judge's failure to deliver a self-defense charge; 2) the inconsistency of verdicts; and 3) misconduct of the prosecutor. Pro Se Supp. Brief, *People v. Graves,* Ind. No. 9064/95 (2d Dep't Aug. 7, 2000).

In a short decision and order, the Appellate Division rejected appellant's argument. Decision & Order, *People v. Graves,* Ind. No. 9064/95 (2d Dep't Mar. 19, 2001). A motion to reargue was denied. Decision & Order on Mot., May 30, 2001. On May 23, 2001, Associate Judge Richard C. Weseley denied petitioner leave to appeal to the New York Court of Appeals from the Appellate Division's Order of March 19, 2001.

### 3. First C.P.L. § 440 Motion

Petitioner moved *pro se* to vacate the judgment of conviction pursuant to C.P.L. § 440.10 on papers dated September 2, 1999. Notice of Mot. to Vacate J. Pursuant to CPL § 440.10, *People v. Graves,* Ind. No. 9064/95 (Kings Cnty. Sup. Ct. Sept. 2, 1999). His grounds were: 1) "the prosecutor failed to disclose state witness criminal record;" 2) the grand jury indictment was jurisdictionally defective; and 3) the jury rendered a self-contradictory verdict. *Id.* Attached was an internal Legal Aid document stating that a "St. Clair, Bibby" had committed a violation.

The motion was denied both on the merits and because "[a]t the time of this writing, Defendant's appeal has not yet been effected." Decision and Order of Justice of Supreme Court Plummer E. Lott, *People v. Graves,* Ind. No. 9064/95 (Kings Cnty. Sup. Ct. Mar. 20, 2001). An application to appeal to the Appellate Division dated April 19, 2001 was denied on July 19, 2001, with no reason given.

4

### 4. Coram Nobis Application

Petitioner *pro se* moved for a writ of error coram nobis by papers dated February 15, 2002. Notice of Mot. for Writ of Error of Coram Nobis, *People v. Graves,* Ind. No. 9064/95 (2d Dep't Feb. 15, 2002). Attached as Exhibit E was the Legal Aid document. The motion was denied by order dated September 16, 2002 because "[t]he appellant has failed to establish that he was denied the effective assistance of appellate counsel (*see Jones v. Barnes,* 463 US 745)." Decision and Order, *People v. Graves,* Ind. No. 9064/95 (2d Dep't Sept. 16, 2002).

### 5. Second C.P.L. § 440 Motion

Petitioner subsequently obtained Bibby's full criminal conviction record. This record revealed that Bibby has a substantial criminal history. Bibby was convicted of three crimes in the three years prior to petitioner's trial. In 1993, he pled guilty to criminal possession of a weapon in the third degree. In 1994, he pled guilty to attempted criminal sale of marijuana. In 1995, he pled guilty to disorderly conduct.

Following the discovery of this new information, by papers dated January 10, 2006, defendant *pro se* filed a second motion pursuant to C.P.L. § 440.30 in Kings County Supreme Court seeking to vacate his conviction on two grounds: 1) the "prosecutor failed to state key witness was on probation and had a pending case and, also changing the spelling of said witness' name on the people's witness list;" and 2) the court imposed a consecutive sentence illegally. Mot. to Vacate J. Pursuant to CPL § 440.30, *People v. Graves,* Ind. No. 9064/95 (Kings Cnty. Sup. Ct. Jan. 10, 2006). The key witness's partial criminal history and the witness list were, respectively, Exhibits G and F.

In a memorandum dated August 10, 2006 and entered August 21, 2006, the trial court denied the motion. Mem., *People v. Graves,* Ind. No. 9064/95 (Kings Cnty. Sup. Ct. Aug. 10,

5

2006). The court rejected the contention that the criminal record was withheld or that the witness list was misleading. *Id.* at 4. It found that the "criminal record was not suppressed by the government . . . information available to the defense, should have alerted defense to [any] discrepancy," *id.* at 8; there was no prejudice in the cross examination of the key witness because of lack of knowledge of his criminal record, *id.*; and the evidence was so strong that "the verdict would have been the same" even if the cross-examiner had had this knowledge, *id.* at 10.

### 6. Motion for Leave to Appeal Second C.P.L. § 440 Motion to the Appellate Division

Defendant applied for leave to appeal from the order denying his second § 440 motion. It was granted on March 7, 2007.

Appointed appellate counsel's brief made two points: 1) "the people's failure to disclose the criminal record of a key witness constituted a *Brady* violation requiring vacatur of appellant's conviction;" and 2) the sentences should run concurrently. Brief for Def.-Appellant, *People v. Graves,* Ind. No. 9064/95, A.D. No. 06-08955 (2d Dep't Nov. 7, 2008).

As to the first point, timely disclosure, it was argued, would have been directly relevant to the key witness's credibility. *Id.* at 11-12. The fact that the witness was on probation would also have adversely affected his credibility. *Id.* at 12. Petitioner contested the argument that the People acted in "good faith;" he argued that the prosecution had a duty to search for the information and then disclose it. *Id.* There was no reasonable way the defense could have discovered this information in view of the confusion of names. *Id.* at 12-13. Finally, petitioner urged that there "is at least a reasonable possibility" that the violation affected the outcome of the case. *Id.* at 16.

6

The Appellate Division affirmed the trial court's decision in its order dated May 19, 2009. It ruled that "there is no reasonable possibility that the nondisclosure affected the outcome of the trial." *People v. Graves*, 62 A.D.3d 900, 901 (2d Dep't 2009).

### 7. Motion for Leave to Appeal to the New York Court of Appeals

An application to appeal to the Court of Appeals was made by letter of counsel dated June 15, 2009. Defendant submitted his own letter dated July 31, 2009. By certificate dated January 26, 2010, the Court of Appeals denied leave to appeal. *People v. Graves*, 13 N.Y.3d 939 (2010).

### 8. Delay in State Appellate Practice Not Attributable to Defendant

The defendant pursued his state remedies in a timely fashion. There is no explanation in the record for the state courts' delay in completing the proceedings in defendant's second § 440 motion until 2010. But, since it cannot be attributed to defendant, it is not ground for deciding that defendant's Rule 60(b) motion was untimely. *See* Part III(A)(1), *infra*.

### B. Federal Court

### 1. Collateral Proceedings in Federal Court

In 2002—following his initial state collateral attacks, and before he received Bibby's full criminal record—petitioner filed a petition for a writ of habeas corpus in this court on the grounds that, *inter alia*, he was denied his Fifth and Sixth Amendment Rights to a fair trial because the prosecution failed to provide his trial counsel with Bibby's full criminal history in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972). *See* Pet. Mot. for Writ of Habeas Corpus, Doc. Entry 1, Dec. 11, 2002.

The petition was denied by this court after a non-evidentiary hearing with petitioner appearing *pro se* by telephone. *See* Mem., Order, & J., Doc. Entry 16, Oct. 15, 2003 (considering eight claims and holding the State had properly rejected them on the merits and had reasonably applied United States Supreme Court precedent in doing so). Assessing the merits of petitioner's *Giglio* and *Brady* claims in 2003, this court concluded that "[t]he papers submitted by defendant appeared to be an internal document of the Legal Aid Society that showed only that the person named ['St. Clair, Bobby'] had committed a violation, not a crime. Defendant did not establish that the People failed to provide him with impeachment material, more specifically, that a defense witness had a criminal record." *Id.* at 31. An application for reconsideration and a Certificate of Appealability were both denied. Order, Doc. Entry 19, Dec. 30, 2003.

A Certificate of Appealability was denied by the Court of Appeals for the Second Circuit. Mandate of Court of Appeals for the Second Circuit, Doc. Entry 21, April 23, 2004. A writ of certiorari was denied by the U.S. Supreme Court. *Graves v. Phillips*, 543 U.S. 1125 (2005).

### 2. Rule 60(b) Motion

Petitioner's current motion under Rule 60(b)(4) is based on the argument that, had this court been properly advised in the original petition that the key witness's criminal record was not made available to defense counsel at trial, it would have granted the petition.

8

III.   **Merits of the Rule 60(b) Motion**

    A. **Motion is Not Procedurally Barred**

        1. **Motion is Timely**

Petitioner was required to exhaust his remedies in state court before he could raise the denial of due process argument in this court through a Rule 60(b)(4) motion. *Pitchess v. Davis*, 421 U.S. 482, 489–90 (1975) (holding that the requirement of 28 U.S.C. § 2254(b)(A) of state exhaustion of remedies applies to collateral attacks on a federal judgment by a Rule 60(b) motion). He thus could not have brought his 60(b) motion until the New York Court of Appeals decided his appeal on January 31, 2010. It was not until then that petitioner had finished arguing at every state level the adverse effect of the failure to disclose the criminal record of the key witness in his case.

Petitioner filed his 60(b) motion shortly thereafter. Pet. Mot. to Vacate J.Pursuant to Fed. Rules of Civ. Proc. Rule § 60(b), Doc. Entry 23, Apr. 19, 2011. This Rule 60(b) motion is timely.

        2. **Motion is Not a Successive Petition**

Petitioner's claim is not barred as a successive petition. Under federal law, if a "claim presented in a second or successive habeas corpus application" was also "presented in a prior application," it must be dismissed unless it relies on either a new rule of constitutional law or newly discovered facts. 28 U.S.C. § 2244(b) (2006). A successive habeas petition must be pre-certified by the Court of Appeals as falling within one of these exceptions. § 2244(b)(3). A Rule 60(b) motion may qualify as a successive habeas petition where it "attacks the federal court's previous resolution of a claim *on the merits*." *Gonzalez v. Crosby*, 545 U.S. 524, 532

9

(2005) (emphasis in original). A 60(b) motion is not considered a successive petition where it "attacks, not the substance of the federal court's resolution of a claim on the merits, but some defect in the integrity of the federal habeas proceedings." *Id.*

In deciding whether the motion properly challenges the procedural aspects of the original habeas petition, the motion should be construed liberally. *See Haines v. Kerner,* 404 U.S. 519, 520–21 (1972) (noting that pro se filings are held to "less stringent standards than formal pleadings drafted by lawyers"). While petitioner has since been appointed counsel for the purposes of this motion, he was not represented by counsel at the time he filed the motion.

Petitioner's 60(b) motion is not a successive petition. Rather than questioning the merits of this court's original decision, petitioner argues that the court's procedures—i.e., its failure to conduct a full evidentiary hearing—did not adequately protect his right to due process. *See, e.g., United States v. Sears,* 396 Fed. Appx. 491, 493 (10th Cir. 2010) (finding that 60(b) motion charging that court failed to grant an evidentiary hearing in habeas case was not a successive petition; failure to grant an evidentiary hearing was procedural).

### B. *Cullen v. Pinholster* Does Not Preclude Reliance on Key Witness' Record

In *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011), the Supreme Court held that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Pinholster* controls the present motion, even though it was not the law in 2003. *See Boyette v. Lefevre*, 246 F.3d 76, 88 (2d Cir. 2001) (in evaluating petitioner's habeas appeal, retroactively applying a rule announced by the Supreme Court after the district court decided the case).

While the criminal record relied on by the petitioner was not before the state court in the state post-conviction proceedings reviewed by this court in 2003, it has since been considered by

10

the state court in petitioner's subsequent collateral attacks.  It follows that *Pinholster* does not

preclude the court from considering Bibby's criminal record in this proceeding.

### C. **AEDPA Would Not Bar Granting Writ**

A federal court may grant a writ of habeas corpus to a state prisoner on a claim that was

"adjudicated on the merits" in state court if it concludes that the adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the Supreme
> Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the
> facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  An "adjudication on the merits" is a substantive, rather than a procedural,

resolution of a federal claim.  *See, e.g., Sellan v. Kuhlman*, 261 F.3d 303, 313 (2d Cir. 2001)

(citing cases, e.g. *Aycox v. Lytle*, 196 F.3d 1174, 1178 (10th Cir. 1999)).

Ordinarily, a state court's conclusions of law are entitled to considerable deference under

AEDPA.  *See* 28 U.S.C. § 2254(d).  Also entitled to weight are state court findings of fact.  28

U.S.C. § 2254(e)(1) (stating that state court factual findings may not be disturbed except upon a

showing of "clear and convincing evidence").  Where, however, "the state court summarily

denie[s] without a hearing [petitioner's] § 440.10 motion to vacate, ... there are no findings of

fact requiring deference." *Drake v. Portuondo*, 321 F.3d 338, 345 (2d Cir. 2003).  Similarly,

where "the state courts d[o] not permit the development of the factual record, and the Appellate

Division relie[s] on that incomplete record," its conclusions of law are not entitled to deference

since "there is...no way for a federal habeas court to assess whether the Appellate Division's

conclusion represented an unreasonable application of federal law." *Drake*, 321 F.3d at 345.

11

New York courts adjudicated petitioner's claim on the merits in his most recent collateral attack on the judgment. *See People v. Graves*, 62 A.D.3d 900 (2d Dep't 2009); *People v. Graves*, 13 N.Y.3d 939 (2010). Nevertheless, the state courts' findings of fact and law are not entitled to deference in this case. Since the state trial court denied the petitioner a hearing, *id.* at 901, there are no findings of fact requiring deference. Nor are there any findings of law binding on this court. In justifying its holding, the Appellate Division offered only its assessment that "there is no reasonable possibility that the nondisclosure affected the outcome of the trial." *People v. Graves*, 62 A.D.3d 900, 901 (2d Dep't 2009). This bare conclusion, without analysis, presents no opportunity for a federal court to assess whether the Appellate Division unreasonably applied federal law. Deference is not required. *See Drake*, 321 F.3d at 345.

### D.  **Motion Denied on Merits**

Petitioner contends that this court's failure to conduct an evidentiary hearing rendered its October 8, 2003 Memorandum, Judgment, and Order denying his habeas petition void. Mem. of L. in Supp. of Pet. Rule 60(b) Mot., Doc. Entry 31, July 28, 2011, at 10. A judgment is void under Rule 60(b)(4) when it "is premised either on a certain type of jurisdictional error or on a violation of due process that deprives a party of notice or the opportunity to be heard." *See United Student Aid Funds, Inc. v. Espinosa,* 130 S.Ct. 1367, 1377 (2010) (citations omitted); *see also Grace v. Bank Leumi Trust Co. of N.Y.*, 443 F.3d 180, 190 (2d Cir. 2005) (holding that a judgment is void "if the Court that rendered it acted in a manner inconsistent with due process of law").

It is contended that respondent's failure to inform this court in 2003 of St. Clair Bibby's prior criminal history prevented this court from making a reasoned decision regarding the necessity of an evidentiary hearing on petitioner's habeas corpus petition. *See* Pet. Mot. to

12

Vacate J. Pursuant to Fed. Rules of Civ. Proc. Rule § 60(b), Doc. Entry 23, Apr. 19, 2010; Mem. of L. in Supp. of Pet. Rule 60(b) Mot., Doc. Entry 31, July 28, 2011. Petitioner argues that an evidentiary hearing in this court would have revealed the full criminal record of the key state witness, which was not available at the criminal trial or during petitioner's initial collateral attacks. Had this history of St. Clair Bibby's prior convictions been timely made known to his state trial attorney, petitioner's attorney could have used this material to undermine Bibby's credibility. He would have used this material to argue that Bibby was a convicted criminal who was seeking to curry favor with the prosecutor by testifying against the petitioner, and should not be given credence.

We now know that Bibby had a substantial criminal record relevant to credibility. This record was apparently not known to petitioner at the time he brought his original petition in this court.

Denying an evidentiary hearing in this court may have been an error critically adverse to the petitioner. While AEDPA limits the ability of federal courts to hear new evidence, 28 U.S.C. § 2254(e)(2), these restrictions do not apply "where a petitioner has been diligent in developing his claim." *Channer v. Brooks*, 320 F.3d 188, 199 (2d Cir. 2003); *see also Michael Wayne Williams v. Taylor*, 529 U.S. 420, 432 (2000) (holding that the restrictions of § 2254(e)(2) only apply when "there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel"). "Where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief, it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry." *See, e.g., Drake*, 321 F.3d at 345-46 (citations and quotations omitted). By contrast, in a case alleging *Brady* violations, due process does not require the court to hold an evidentiary

13

hearing where the evidence "conclusively established that the Government possessed no exculpatory evidence to disclose." *Pimintel v. United States,* No. 96-CV-5891, 2008 WL 2151796, at *11 (S.D.N.Y. May 21, 2008) (denying petitioner relief under Rule 60(b)(4)).

Petitioner appeared pro se when he argued his initial habeas petition in 2003. The court denied his request for counsel. Order Denying Mot. to Appoint Counsel, Doc. Entry 15, Oct. 14, 2003. Working from prison, without counsel to aid him, petitioner had limited opportunity and ability to uncover Bibby's criminal record. The only evidence he was then able to provide to the court was an internal document of the Legal Aid Society that indicated that a "St. Clair, Bobby" had committed a violation. Mem., J., and Order, Doc. Entry 16, Oct. 15, 2003, at 31. The respondents denied that there was any evidence that Bibby had a criminal record. *Id.* Based on the available papers, this court found that there was no evidence that Bibby had a criminal record or, if he did, that it would not provide the petitioner with substantial impeachment material that could potentially alter the outcome of the criminal trial. *Id.*

Given his circumstances, petitioner made "a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court" before bringing his initial federal habeas petition. *Williams,* 529 U.S. at 435. He could not obtain the necessary documents to properly argue the case, particularly when he was appearing pro se.

The evidence before this court in 2003 did not conclusively establish that the prosecution in petitioner's case did not have any exculpatory evidence. The court erroneously relied solely on the inadequate papers submitted by the parties in finding that the petitioner failed to adequately support his *Brady* and *Giglio* claims. Mem., J., and Order, Doc. Entry 16, Oct. 15, 2003.

14

It has since become clear that St. Clair Bibby had a substantial criminal record at the time of petitioner's trial. Had this court granted a hearing on petitioner's original habeas petition, respondents would have been required to locate and turn over Bibby's criminal record. At the hearing, this court would have inquired into why the prosecution failed to turn these records over to the petitioner prior to trial.

In order to grant petitioner relief from the judgment—i.e., to grant petitioner's habeas petition—this court must also find that he is entitled to the relief he seeks. As noted above, petitioner argues that the prosecution's failure to turn over Bibby's criminal record constituted a *Brady* violation. To demonstrate a violation of his rights under *Brady*, a defendant must show that: "(1) the Government, either willfully or inadvertently, suppressed evidence; (2) the evidence at issue is favorable to the defendant; and (3) the failure to disclose this evidence resulted in prejudice." *United States v. Coppa*, 267 F.3d 132, 140 (2d Cir. 2001). For the reasons detailed below, while the government appears to have suppressed evidence favorable to the defendant, failure to disclose did not prejudice the petitioner.

## 1. **The Government Suppressed Evidence**

Under *Brady*, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. Prosecutors have a duty to disclose such evidence even where there has been no request by the accused. *United States v. Agurs*, 427 U.S. 97, 107 (1976).

Because the rule encompasses evidence that may have been "known only to police investigators and not to the prosecutor," "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf . . . , *including the*

15

police." *Kyles v. Whitley*, 514 U.S. 419, 437-38 (1995) (emphasis added); *see also United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998). The Court of Appeals for the Second Circuit has indicated that a prosecutor may have constructive or actual knowledge of exculpatory evidence known to other prosecutors working in the same office. *See Avellino*, 136 F.3d at 255 (noting that allegation of defendant convicted in the Eastern District that "pertinent Eastern District prosecutors had reason to know that the unopened boxes of State materials contained information with respect to [a prior investigation of a key witness] . . . raise[s] a number of troublesome questions," but ruling that any such evidence was not material). A prosecutor may also be deemed to have constructive notice of evidence in the possession of the "prosecution team." *See United States v. Locascio*, 6 F.3d 924, 949 (2d Cir. 1993) (holding that *Brady* materials need not be disclosed if the "prosecution team in the instant case" is unaware of the materials). The government thus must actively seek *Brady* material "in its files and *in the files of related agencies reasonably expected to have possession of such information*." *Coppa*, 267 F.3d at 140 (emphasis added).

In many circuits, the prosecution is obligated to find and turn over the criminal records of key witnesses. *See, e.g., Crivins v. Roth*, 172 F.3d 991, 997-998 (7th Cir. 1999) (holding that the prosecutor had a duty to locate the criminal record of a key witness and was not excused from doing so because the witness used an alias); *United States v. Brooks*, 966 F.2d 1500, 1502-03 (D.C. Cir. 1992) (holding that the prosecutor had a duty to search police records for impeachment material about a key witness following a request by defense counsel); *United States v. Osorio*, 929 F.2d 753, 761 (1st Cir. 1991) ("The government, as represented by its prosecutors in court, is under a duty of inquiry regarding information concerning the criminal past of its cooperating witnesses . . . ."); *United States v. Perdomo*, 929 F.2d 967, 970-71 (3d Cir.

16

1991) (holding that nondisclosure of witness's criminal background constituted a *Brady* violation, since the information was readily available to federal prosecutors in local police records).

A prosecutor *does not have an unlimited duty* to inquire of other offices not working with the prosecutor's office on the case in question. "[K]nowledge on the part of persons employed by a different office of the government does not in all instances warrant the imputation of knowledge to the prosecutor." *Avellino,* 136 F.3d at 255; *see also, e.g., Locascio,* 6 F.3d at 949 (refusing to impute knowledge of reports prepared by FBI agents who were "uninvolved in the investigation or trial of the defendants-appellants" to federal prosecutors); *United States v. Quinn,* 445 F.2d 940, 944 (2d Cir. 1971), *cert. denied,* 404 U.S. 850 (1971) (refusing to impute Florida prosecutor's knowledge of the indictment of an important government witness that was unsealed a week before trial in New York).

In this case, during petitioner's criminal trial, the prosecution flatly told the petitioner-defendant's attorney that Bibby did not have a criminal record:

| MR. BAUM [for defendant]: | I would ask Mr. Irvin if there are any other instances of bad acts or any other allegation that this defendant robbed a store prior to January 14, 1995 that he is aware of? |
|---|---|
| MR. IRVIN [for the people]: | Not that I am aware of. |
| MR. BAUM: | Mr. Irvin has already represented that this witness does not have a criminal record; is that right? |
| MR. IRVIN: | *No criminal record.* |

Trial Tr. at 1439 (emphasis added). Whether or not the prosecutor had the obligation to find out if his key witness (with an alias) had a criminal record, he certainly could not mislead the defense, as was done here, by affirmatively indicating there was no such record. At the very

17

least, defendant was entitled to rely on that certification of no record, avoiding any duty to investigate himself.

The prosecutor's duty under *Brady* was violated. The question is, did it affect the verdict?

## 2. The Evidence Was Favorable to the Defendant

The criminal record of a key witness such as Bibby can provide valuable impeachment material for the defense. Because petitioner's attorney did not have Bibby's criminal record, the direct and cross examination on the criminal conduct of this key witness was much blander than it otherwise would have been.

The following excerpts from the direct and cross examination of St. Clair Bibby illustrates the lack of the effectiveness of the attack on the key witness's credibility. *See also* Trial Tr. at 1420-1572.

Direct Examination of Bibby:

> A    It was a health food store [where the shooting took place].
> Q    Was anything else sold there that wasn't healthy?
> A    Only one thing.
> Q    What was that?
> A    Marijuana, weed.
> Q    Did you sell that yourself?
> A    Yes.
> Q    Have you yourself used marijuana?
> A    Yes.
> Q    How long have you used it for?
> A    I used it for like a month.  In a month I would smoke like
> two or three bags, but and that's it for a month.

Trial Tr. at 1422. The cross examination of Bibby allowed the witness to picture himself as a minor user of marijuana and a pawn of its seller.

18

Q Let me ask you this:  When you began working at 380 Stone Avenue, how many days a week did you work?

A I work like five day.

Q Five days a week?

A Yes.

Q How much weed was sold on a daily basis there?

A Huh?

Q How much weed did you sell out of that store?

A Like 200 or 300.

Q Two or three hundred dollars a day?

A Yeah.

. . .

Q People would come in and for nickels and dimes they would give their money, correct?

A Yes.

Q But if they wanted larger amounts, sometimes Pops or you would give them those larger amounts and they would pay the money later, correct?

A Not me.

Q But you know Pops did that, right?

A Pops might do that, yeah.

Q How much was a pound of weed, do you know?

A I never sell a pound of weed.

Q Didn't Pops sell pounds of weed for $1,500?

THE COURT: Where?

MR. BAUM: Out of 380 Stone Avenue.

A No, not to my knowledge.

. . .

Q Where was it hidden away, where in the store?

A It was hidden away?

Q Yes.

A I don't know. *Certain things I don't know*, certain things I know.

Q You knew there was a pound or two pounds of weed in the store, correct?

A Yes.

Q But you didn't know where Pops stashed it?

A No.

Q If you ran out of weed on a given night, Pops would come back with more weed, right?

A Yeah.  He come then he would have it.

Q Or he would go down to the basement?

A Right.

Q And he would pick it - -

19

  A  When he come back, he would have it or he didn't come back without it.  Either he comes back or he just don't have none.

  . . .

  Q  Have you yourself ever gone down there to take up drugs to be sold upstairs?

  A  Take drugs or take weed?

  Q  Yes.

  A  I never take it.

  Q  Where did you get - -

  A  It was given to me.

  Q  By Pops?

  A  Yes.

  Q  When he gave you the weed, where did he get it from?

  A  I don't know where he get it from.  He would have it downstairs stashed somewhere. *I don't know where he have it.*

Trial Tr. at 1449-1456 (emphasis added).

  Q  When you finally began to receive payment from Pops, did he pay you all the money back he owed you?

  A  No, I never received no money from Pops.

  Q  You worked out of the goodness of your heart?

  A  Yes.

  Q  Were you sharing in the proceeds or the monies that he was getting?

  A  No.

  Q  Were you just doing it because you were being kind to Pops?

  A  Yes.

Trial Tr. at 1462.

The witness disavowed his extensive knowledge of guns despite his unrevealed gun conviction:

  Q  What about weapons?

  A  Weapons?

  Q  Yes, sir.

  A  Weapons used to keep downstairs.

  Q  The weapons were kept downstairs.

  A  Yes.

20

Q        The weapons that you would keep in 380 Stone Avenue include a machete, right?

A        Yes.

Q        That was Pops' machete?

A        Yes.

Q        There were also guns that he kept downstairs?

A        He had one gun.

Q        What kind of gun was that?

A        A nine millimeter.

Q        Whose gun was that?

A        That was Troy's gun.

Q        Troy kept his gun down there?

A        No - - yes, the gun downstairs.

Q        When Troy used to go home at night, he took his gun with him, didn't he?

A        Sometimes.  Sometimes he leave it in the store.

Q        Troy didn't always work in that store, right?

A        No, he never used to work in the store.

Q        Excuse me?

A        When he start working there he used to do that.

Q        But before - -

A        But before that - -

Q        *Before that, you had other weapons that were down there?*

A        *I never had nothing.*

Q        *You didn't have anything?*

A        *No.*

Q        But there were other guns that were kept down there, weren't there?

A        Yes.

Q        You knew about those guns?  You knew they were there?

A        Yes.

Q        Was one of those guns a .38 revolver?

A        I know they used to keep guns down there.  Pops might keep a gun down there.

Q        Guns were kept there for security reasons, right?

A        Yes.

Q        Do you know what kind of guns were in the store down there?

A        Before they used to keep guns downstairs, right.

THE COURT:     *What kind, do you know?*
THE WITNESS: *No, I don't know what kind.  Small.*

Q        Small guns?

A        Yes.

Q        Troy had an automatic, correct?

21

| | | |
|---|---|---|
| A | Yes. | |
| Q | That was a nine millimeter automatic? | |
| A | Yes. | |
| Q | And you had seen that before, correct? | |
| A | Yes. | |

Q      You have seen guns before, correct, before January 14, 1995?

| | |
|---|---|
| A | Yes, I see guns. |

Q      You know the difference between say a revolver and nine millimeter automatic, correct?

| | |
|---|---|
| A | A revolver. |
| Q | Excuse me? |
| A | A revolver. |

*Q      You know the difference between a revolver and a nine millimeter automatic, correct?*

*A      Not really.*

| | |
|---|---|
| Q | Have you seen different nine millimeter guns? |
| A | Yes. |

Q      You know the difference between say a nine millimeter and a .25 automatic?

| | |
|---|---|
| A | Yes. |
| Q | There is no doubt about that, right? |

A      Yeah.  It was a .25 - - if it doesn't say .25, I don't know what it is.

| | |
|---|---|
| Q | A .25 is smaller than a nine millimeter, correct? |
| A | You have seen a .25 automatics before, correct? |
| A | Possible I did - - where in the store? |
| Q | Yes. |
| A | No, in the store. |

Q      You know the difference between a nine millimeter and a .25 automatic?

| | |
|---|---|
| A | Yes. |

Trial Tr. at 1471-1475 (emphasis added).

| | | |
|---|---|---|
| Q. | Troy had a black nine millimeter automatic, didn't he? | |
| A. | Yes. | |
| Q. | Did you see the kind of gun that Carlos had? | |
| A. | Carlos had either a silver gun or a chrome gun. | |
| Q. | Silver or chrome. | |
| A. | That's the color, yeah, automatic. | |
| Q. | *Do you know what kind of gun it was?* | |
| A. | *No, I don't know what kind of gun it was.* I know I told the |

detective.

  . . .

22

    Q.    Did you ever tell the detectives that Carlos had a .25 automatic?

    A.    Yes, it's possible.

    Q.    You're not sure.

    A.    It's possible I told them in the hospital.

    . . .

    Q.    Isn't it a fact, sir, that during your conversation with the Assistant District Attorney at your home on January 15 you told them that Carlos had a .25 automatic, correct?

    A.    I tell them that when I was at home.

    Q.    Did you in fact tell them that it was a two-five—

    A.    I can't remember.

    Q.    On January 15, 1995, you were present at your home in Brooklyn with an Assistant District Attorney?

    A.    Yes.

    Q.    And you were being asked questions and you gave answers at that time, correct?

    A.    Yes.

    Q.    And those questions and – the answers that you gave were under oath, correct?

    A.    Yes.

    Q.    In other words, you were sworn to tell the truth, right?

    A.    Yes.

    Q.    You were asked these questions and gave these answers:
        QUESTION: When he first approached you outside—
        ANSWER:   Yes.
        QUESTION:  --do you know what the gun looked like?
        ANSWER:    It looked like a two five.
        Isn't that what you said?

    A.    It looks like that's what I said, right.

        …

    Q.    You said before you know the difference between a nine millimeter and a two-five, didn't you?

    A.    Yes.

Trial Tr. at 1521-1526 (emphasis added).

The defense in its summation left the credibility of the key witness largely unscathed, in part relying on what that witness told the jury about how the incident unfolded. *See* Trial Tr. at 1867, 1868, 1869, 1877, 1888. *But see id.* at 1891 (arguing that ballistic evidence contradicted key witness's testimony); *id.* at 1894 ("Do not assume that . . . one of these guys that testified for the prosecution, did not shoot [the deceased]."). Had Bibby's criminal record been known,

defense counsel might have more directly accused this key prosecution witness of the deadly shooting and hammered harder at his lack of credibility.

We now know that, at the time of petitioner's trial, Bibby had pled guilty to gun possession. Given the skill and force of the cross-examiner, had the petitioner's attorney been armed with the knowledge of Bibby's criminal record, the credibility of this key witness would probably have been attacked more forcefully.

### 3. A Different Result Was Not Reasonably Probable

#### a. Effect on Result Necessary

A criminal defendant is entitled to a new trial where the suppressed evidence is material – i.e., where "disclosure of the suppressed evidence to competent counsel would have made a different result reasonably probable." *Kyles*, 514 U.S. at 445. This is neither a test of sufficiency of the evidence nor of harmless error. Rather, a "reasonable probability" of a different result is shown where the government's evidentiary suppression "undermines confidence in the outcome of the trial." *Id.* at 435; *see also Leka v. Portuondo*, 257 F.3d 89, 104 (2d Cir. 2001) ("The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial . . . resulting in a verdict worthy of confidence.") (internal quotations and citations omitted). The Supreme Court has emphasized the degree of professional judgment involved in applying the test:

> Although the constitutional duty is triggered by the potential impact of favorable but undisclosed evidence, a showing of materiality *does not require demonstration by a preponderance* that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal (whether based on the presence of reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant) . . . . *[I]t is [also] not a sufficiency of evidence test.* A defendant need not demonstrate that after discounting the inculpatory

24

> evidence in light of the undisclosed evidence, there would not have been enough
> left to convict. The possibility of an acquittal on a criminal charge does not imply
> an insufficient evidentiary basis to convict. One does not show a *Brady* violation
> by demonstrating that some of the inculpatory evidence should have been
> excluded, but by *showing that the favorable evidence could reasonably be taken
> to put the whole case in such a different light as to undermine confidence in the
> verdict.*

*Kyles*, 514 U.S. at 434-35 (emphasis added). Suppressed evidence is thus material if, "[b]ecause

the State withheld evidence, its case was much stronger, and the defense case much weaker, than

the full facts suggested." *Id.* at 428,

A "reasonable probability" requires more than a showing that a different result was "a

reasonable *possibility.*" *Strickler v. Greene*, 527 U.S. 263, 291 (1999) (emphasis in original). In

*Strickler*, for example, the Court found that a new trial was not warranted: although the

prosecution had failed to disclose "potentially devastating impeachment material" regarding an

eyewitness, "there was considerable forensic and other physical evidence linking petitioner to the

crime," as well as the testimony of other witnesses that placed the defendant at the scene of the

crime. *Id.* at 291-94.

Suppressed impeachment evidence is necessarily material where the witness at issue

"supplied the only evidence linking the defendant(s) to the crime," *United States v. Payne*, 63

F.3d 1200, 1210 (2d Cir. 1995) (parentheticals in original; citations and quotations omitted); *see

also Giglio*, 405 U.S. at 154-55 (finding a *Brady* violation where the government failed to

disclose a promise not to prosecute cooperating witness on whom government's case against

defendant "almost entirely" depended). Impeachment evidence is also material "where the likely

impact on the witness's credibility would have undermined a critical element of the

prosecution's case." *Payne*, 63 F.3d at 1210; *see also Kyles*, 514 U.S. at 441 (granting a new

trial where "the essence of the State's case was the testimony of eyewitnesses" and suppressed

impeachment evidence would have "substantially reduced or destroyed" the value of those witnesses); *United States v. Badalamente*, 507 F.2d 12, 17-18 (2d Cir. 1974) (finding a *Brady* violation where nondisclosure of letters that would have had "powerful adverse effect" on witness's credibility, where that credibility was "crucial to the determination of [the defendant's] guilt or innocence"), *cert. denied*, 421 U.S. 911 (1975).

A new trial is generally not required when the testimony of the witness is corroborated by other testimony or evidence. *See, e.g., United States v. Orena*, 145 F.3d 551, 558-59 (2d Cir. 1998) (holding that undisclosed impeachment evidence was immaterial because there was substantial independent evidence of the defendants' guilt, including telephone records and the testimony of another witness that implicated the defendants in the murder conspiracy); *Payne*, 63 F.3d at 1210 (holding that a new trial is not required where witness's testimony was "but a fraction of the evidence" linking the defendant to the crime). It is not enough that "the suppressed impeachment evidence merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable." *Payne*, at 1210; *see also United States v. Spinelli*, 551 F.3d 159, 165 (2d Cir. 2008) (holding that a new trial is not required where "information withheld is merely cumulative of equally impeaching evidence introduced at trial, so that it would not have materially increased the jury's likelihood of discrediting the witness"); *Orena*, 145 F.3d at 558-59 (holding that undisclosed impeachment evidence was immaterial where defendants possessed and used strong impeachment evidence separate and apart from the undisclosed information).

b. **No Effect on Result**

Even if Bibby's criminal record had been in the hands of petitioner's defense attorney, a different result was not reasonably probable. Bibby's testimony was not the only evidence

connecting the petitioner to the crime. The prosecution's case included the testimony of multiple witnesses, including that of an alleged co-conspirator of the petitioner's, who largely corroborated Bibby's testimony.

Moreover, use by defense counsel of the key witness's criminal record and parole status to suggest that his testimony had been tailored to gain favor with the State would have presented serious dangers to the defendant, with the strong possibility of a devastating boomerang effect. The state would have been able to show that the witness had made prior consistent statements predating any motive to fabricate. *See, e.g., People v. Seit*, 86 N.Y.2d 92, 96 (1995) (noting that New York law allows the introduction of the prior consistent statements of a witness to rehabilitate the credibility of a witness whose testimony has been attacked as a recent fabrication). On the day of the shooting, immediately after being treated for serious gunshot wounds to his leg, the witness had made detailed statements to a detective and to an assistant district attorney naming "Carlos [Graves]," the defendant, as one of the perpetrators of the attempted robbery and as the person who shot him and who shot the deceased. It is unlikely that Bibby would have the capacity and foresight to fabricate the story he gave on the witness stand in this moment of stress.

The prior statements made after the shootings (and confirmed shortly thereafter), while the witness was still under the excitement caused by his own wounding in the fracas, were powerfully supportive of his trial testimony. One detective's contemporaneous official written report reads as follows:

1.  The undersigned reports that on January 15, 1995 at approximately 0200 hours I spoke with Sinclair Bibby at Brookdale Hospital emergency room. Sinclair Bibby gave the following statement of the incident:

    I was working at the store tonight. I walked out for a few minutes to get something to drink. When I walked back towards the front door of the store, a

guy I know as Carlos put a gun to my back and forced me in.  Carlos forced me to the door by the plexi-glass.  I screamed for the people behind the plexi-glass to open the door Carlos shot me in the leg.  Someone then opened the door and I was forced down to the ground.  I felt like I was shot again.  I saw Pops struggling with Carlos and Fats shooting at Carlos with a gun.  I saw Pop fall to the ground and saw Carlos shoot Fats.  When the shooting stopped I looked towards the door and saw Carlos fall by the front door, get up and run out of the store.  I got up and ran towards the front door and locked it so that he couldn't come back and shoot me again.  I then ran to the phone behind the plexi-glass and tried to call the police.

2.  The undersigned asked Sinclair if he had any further information on the subject Carlos.  Sinclair stated he knew Carlos by seeing him in the area.  He further stated that Carlos was arrested at 380 Mother Gaston Blvd. with a shot gun sometime last September.

Resp't Letter Opposing Rule 60(b) Motion, Ex. 1, Doc. Entry 38, Aug. 29, 2011. The day after the event, a detective took a taped statement from the key witness in his apartment.  Resp't Letter Opposing Rule 60(b) Motion, Ex. 2, Doc. Entry 38, Aug. 29, 2011.  It again fully confirmed the trial testimony of the witness.  Given this confirmatory material, it seems highly unlikely that the criminal history of the witness would have swung the jury towards acquittal.

That the suppressed evidence would have changed the result cannot, in the instant case, be deemed reasonably probable.

IV.   **Conclusion**

Based upon an analysis of the record and the law, there appears to be no ground to set aside the judgment dismissing the petition for a writ of habeas corpus. It can be assumed from the record that a constitutional error was committed when the key witness's criminal record was not revealed. But, as indicated in Part III(D)(3), *supra*, the use of the record to argue lack of credibility of the key witness would have opened the door to highly destructive confirmatory proof by prior consistent statements.  Whether defense counsel opened that door by using this

28

"withheld information," or whether he would have kept it closed by not delving into the criminal record, the result would have been the same—a conviction.

Were a certificate of appealability required for a Rule 60(b) motion to be appealed, it would be granted by this court in this case in view of the serious factual and legal problems presented. A fresh view by a panel of the Court of Appeals for the Second Circuit might be helpful.

The motion is denied.

SO ORDERED.

Jack B. Weinstein
Senior United States District Judge

Dated: Brooklyn, New York
March 23, 2012